IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

AMBER S. THARP                                                                                      PLAINTIFF

      v.                          Civil No. 14-5266

NURSE RHONDA BRADLEY; NURSE
RHONDA MESCHEDE; DR. MULLINS; and
NURSE PEGGY VICKERY                                                                      DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by the Plaintiff pursuant to 42 U.S.C. § 1983. Plaintiff proceeds *pro se* and *in forma pauperis.*

Plaintiff is currently incarcerated in the Federal Correctional Institute Carswell, Federal Medical Center, in Ft. Worth, Texas. The events that are the subject of this case occurred while the Plaintiff was incarcerated in the Washington County Detention Center (WCDC) in Fayetteville, Arkansas. Plaintiff contends her constitutional rights were violated when Defendants denied her adequate medical care. The claims that remain in this lawsuit are her claims against the Defendants in their individual capacities.

Defendants filed a Summary Judgment Motion (Doc. 55). A hearing was held on February 2, 2016, to allow Plaintiff to testify in response to the Motion. Plaintiff appeared by video conference. She also submitted a number of exhibits (Doc. 64) that were admitted during the hearing.[1] The Motion (Doc. 55) is ready for decision.

---

[1] The Court said it would give no weight to any annotations Plaintiff had made to the records she submitted as exhibits. Plaintiff's exhibits dealing with the relevant time period are for the most part duplicates of documents already submitted by the Defendants. Plaintiff has also submitted a number of documents from time periods subsequent to the period at issue in this case. These are, of course, not relevant to whether the Defendants were deliberately indifferent to her medical needs during her 2013 incarceration in the WCDC.

**1. Background**

Plaintiff was booked into the WCDC on May 22, 2013, and reported a history of seizures. *Defendants' Exhibit* (hereinafter *Defts' Ex.*) A-1 at 2 & 82.[2] She was on no medications. *Id.* at 82. She testified she had never been on any seizure medication. Plaintiff was asked if she had any allergies and said she did not but had kidney reflux.[3]

She reported having a seizure on July 26, 2013. *Defts' Ex.* A-1 at 72. She testified Nurse Bradley told her to submit a sick call slip so she could be placed on seizure medication. Plaintiff submitted a medical request on July 29, 2013. *Defts' Ex.* A-1 at 147.

Plaintiff was seen by Dr. Mullins for the first time related to her seizures on July 30, 2013.[4] *Defts' Ex.* D at ¶ 2(c). She reported a history of seizures and Dr. Mullins prescribed Dilantin[5] for her seizure disorder to be taken 100 mg. in the morning and 200 mg. in the evening. *Id.* She had never taken Dilantin before. Plaintiff testified that Dr. Mullins would have been aware that she had kidney reflux because she had made them aware of it at intake.

Plaintiff testified she received her first dose of Dilantin on July 31, 2013. Two days later, Plaintiff testified she began to develop small red splotches. By the third day, Plaintiff testified it had developed into "one big rash." She testified she was running a fever, could not eat, and had sores in the back of her throat. That day, Plaintiff testified the nurses came and took her pulse, listened, to her heart, and said they would come back that day. Plaintiff testified she told

---

[2] Page citations in this exhibit are to the jail file page number located at the bottom center of the page.

[3] Vesicoureteral reflux is the abnormal flow of urine from your bladder back up the tubes (ureters) that connect your kidneys to your bladder.
http://www.mayoclinic.org/diseases-conditions/vesicoureteral-reflux/basics/definition/con-20031544 (accessed July 6, 2016).

[4] Dr. Mullins had seen Plaintiff for other complaints not associated with seizures and/or seizure medication.

[5] Dilantin is a brand name for phenytoin. Phenytoin is used to control certain type of seizures. Phenytoin is in a class of medications called anticonvulsants.
https://www.nlm.nih.gov/medlineplus/druginfo/meds/a682022.html (accessed July 6, 2016).

the nurses she might have scarlet fever. According to Plaintiff, no one checked into drug allergies. No record of this contact with medical staff appears in the exhibits.

Plaintiff's first mention of any type of rash or outbreak on a medical request occurred on August 11, 2015. *Defts' Ex.* A-1 at 148. She indicated she needed Benadryl because she was breaking "out with hives." *Id.* Plaintiff testified the rash was visible all over her body.

At approximately 7:30 p.m., the intercom button was pushed in Z-block and Corporal Jones was informed that Plaintiff had a fever all day and was drooling. *Defts' Ex.* A-1 at 68. Nurse Meschede came and took the Plaintiff's temperature and it was 98.6 degrees. *Id.* Nurse Meschede informed the Plaintiff that she would be put on the list to see a doctor. *Id.* Corporal Jones was instructed to keep an eye on Plaintiff throughout the night. *Id.*

On August 12, 2013, Plaintiff testified she was scheduled for court and the guard asked what was wrong with her and said he could get her court rescheduled. Plaintiff did not believe detention center officials wanted her to be taken before the state court judge in the condition she was in.

Although there is an incident report completed by Deputy Johnson on August 12, 2013, in which she reported that Plaintiff was flushed, was very red with splotches, felt very hot and clammy, and her eyes were glassed over, there is no mention of Plaintiff being scheduled for court on this day. *Defts' Ex.* A-1 at 67. Plaintiff's condition was reported to the nurse's station. *Id.* Later that day, Plaintiff was transported to Washington Regional Medical Center (WRMC). *Id.* She was diagnosed with urticaria or hives, given an injection of Depo-Medrol, and put on Benadryl. *Defts' Ex.* C at 6-8.[6]

---

[6]Page references to this exhibit are to the Tharp Medical Record page numbers located at the bottom center of the page.

Corporal Jones completed an incident report on August 12, 2013. *Defts' Ex.* A-1 at 63. She noted that Plaintiff stated she was vomiting, still had a fever, and that the shot she received at the hospital was not working. *Id.* Plaintiff complained of feeling worse and asked for Benadryl and Tylenol. *Id.* Nurse Meschede approved the Benadryl. *Id.* It was noted that Plaintiff was now shaking. *Id.* A nurse was requested to come to the cell block and evaluate the Plaintiff. *Id; see also Defts' Ex.* A-1 at 65 (incident report of Deputy Center) & 66 (incident report of Nurse Meschede).

Nurse Meschede checked Plaintiff and instructed Corporal Jones to give Plaintiff two Tylenol and have her moved to medical holding so she could be monitored throughout the night. *Defts' Ex.* A-1 at 63 & 78-79. Plaintiff did not make any complaints of discomfort during the hourly welfare checks. *Id.*

Although she could not recall seeing him, Dr. Mullins indicates he saw Plaintiff on August 13, 2013. *Defts' Ex.* D at ¶ 2(d). He reviewed her hospital records and noted she had been diagnosed with urticaria or hives which he described as a vascular reaction of the skin marked by transient appearance of smooth, slightly elevated patches (wheals) which are redder or paler than the surrounding skin and often attended by severe itching. *Id.* He indicated the condition rarely lasted for more than two days. *Id.*

Dr. Mullins examined Plaintiff and found the rash was smooth and homogenous--not typical for strep, but Plaintiff complained of a sore throat. *Defts' Ex.* D at ¶ 2(d). Dr. Mullins wanted to rule out strep. *Id.* He prescribed penicillin VK 500 mg., four times a day, for ten days, which he describes as being excellent for skin infections, Benadryl, 25 mg three times a day, which he indicates is an antihistamine to treat itching, and a Medrol dose pak, which he indicates is a steroid excellent for treating rashes and allergies. *Id.*

Dr. Mullins states he was unable to determine what caused the rash but that he treated her reasonably and appropriately given her symptoms. *Defts' Ex.* D at ¶ 2(d). Further, he states his treatment was according to the instructions of the physicians at WRMC. *Id.* Dr. Mullins did not see her after August 13, 2013. *Id.*

Plaintiff testified she was in medical holding from August 13 to August 19, 2013. Plaintiff testified that the rash would get better when the Benadryl would begin working but when the Benadryl was gone the rash would come back. Plaintiff testified she was getting frustrated with them because no one was listening to her.

On August 19, 2013, Nurse Meschede cleared Plaintiff to go to general population. *Defts' Ex.* A-1 at 62. On August 19, 2013, Plaintiff testified the rash was still present all over her body. She was prescribed Benadryl and Tylenol and because she was still nauseous she was also given Zofran.[7]

Corporal Guhary filled out a report concerning an incident on August 20, 2013. *Defts' Ex.* A-1 at 61. Plaintiff reported feeling very badly and was escorted to the nurses' station. *Id.* Plaintiff was given Tylenol and detention personnel were directed to give Plaintiff Tylenol every four to six hours. *Id.* Corporal Guhary reported that later that day Plaintiff's teeth were chattering, she was moaning, and throwing up. *Id.* He gave her Tylenol and Bismuth Tabs for nausea/vomiting, and cold water. *Id.* He instructed her to lie down. *Id.*

On August 21, 2013, Plaintiff submitted a request asking for Tylenol or Aleve for a chronic migraine plus she said she was still sick. *Defts' Ex.* A-1 at 148. Nurse Bradley restarted Tylenol. *Id.*

---

[7] A brand name for ondansetron. This drug is used to prevent nausea and vomiting. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a601209.html (accessed July 6, 2016).

AO72A
(Rev. 8/82)

Corporal Guhary also submitted an incident report about August 21, 2013. *Defts' Ex.* A-1 at 60. He noted the Plaintiff was bright red and covered in a blotchy rash. *Id.* Her skin was hot to the touch. *Id.* He noted the nurse had just left the block after administering two Tylenol and two Benadryl. *Id.* He gave Plaintiff some water and told her to wait twenty or thirty minutes for the medicine to kick in. *Id.*

On August 22, 2013, Nurse Vickery called Dr. Mullins and he ordered an injection of Zofran, a Medrol dose pack, and Benadryl 25 mg., three times a day. *Defts' Ex.* A-1 at 137. According to the Plaintiff, Nurse Bradley sent her back upstairs saying the rash had subsided. Plaintiff testified the rash had not subsided and within a day she was sick again. At this point, Plaintiff indicated the rash was becoming more painful.

Plaintiff testified she was very sick and had thrown up the night before. The inmates were left to take care of her. Instead of asking her, Plaintiff testified Nurse Bradley would ask the inmate next to the Plaintiff what symptoms the Plaintiff was experiencing. At this point, Plaintiff said it was just a guessing game as to what caused her rash. In fact, Plaintiff testified that Nurse Meschede asked if Plaintiff thought the rash could be related to the Plaintiff working out. Plaintiff testified she kept telling them that she thought it was the medicine.

On August 23, 2013, Sergeant James Morse contacted Nurse Bradley at home asking whether Plaintiff should be taken to the hospital. *Plff's Ex.* A (Doc. 64) at 14. He noted that Plaintiff's skin color was red from the head, face, hands, and neck area. *Id.* Nurse Bradley indicated Plaintiff did not need to go at that time but directed that Plaintiff be given two tablets of Benadryl and that she continue to be monitored for worsening signs. *Id.* If her condition worsened, he was instructed that it would be okay to take her to the hospital. *Id.* Plaintiff was taken to the hospital approximately an hour later. *Plff's Ex.* A at 20.

Plaintiff was seen at the emergency room by Dr. Tutt. *Defts' Ex.* C at 21, 25. He thought Dilantin might be causing the problem and ordered it to be discontinued. *Id.* He started her on Keppra[8] and continued her Benadryl and Medrol. *Id.* His discharge diagnosis was dermatitis, non-specific. *Plff's Ex.* B at 49.

Nurse Vickery filled out an incident report when Plaintiff returned to the hospital noting that she would no longer be on Dilantin but would be placed on Keppra instead and continued on the Benadryl and Medrol and be given Ibuprofen for fever. *Defts' Ex.* A-1 at 57. Nurse Vickery noted they were to watch for increasing area of redness or pain in her skin, yellow crusts or wet drainage from the rash, fever over 99.5°F, joint pain, or new rash. *Id.* She also noted Plaintiff was to have her kidney function rechecked in a week. *Id.*

On August 24, 2013, Sergeant Morse completed an incident report noting that Plaintiff was again having a flare up of her rash and temperature. *Defts' Ex.* A-1 at 56. Nurse Vickery was called, Plaintiff's medications were reviewed and the decision made to move her to medical holding. *Id.* Because of concerns that the flare up could be caused by the cell she was in or the clothing or bedding, the medical holding cell was cleaned and a uniform and blanket were washed on different settings. *Id.* Plaintiff was moved and provided the clean clothing and bedding. *Id.*

On August 25, 2013, Deputy Hubbard completed an incident report. *Defts' Ex.* A-1 at 54. He noted Plaintiff was covered with rash from head to toe and complaining of pain. *Id.* He attempted to contact Nurse Vickery and Nurse Meschede. *Id.* After he could not reach them and had not received a return phone call, about an hour later he contacted Nurse Bradley who instructed them to transport Plaintiff to WRMC. *Id.*

---

[8]Keppra is a brand name for the drug levetiracetam. The drug is used to combat seizures. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a699059.html (accessed July 7, 2016).

On August 25th, Plaintiff testified she was admitted to the hospital and diagnosed with Stevens-Johnson syndrome (SJS) at the emergency room by Dr. Gordon Parham.[9] *See also Defts' Ex.* C at 55; *Plff's Ex.* A at 29. Plaintiff was admitted to the hospital. *Defts' Ex.* A-1. at 55-56. On August 26, 2013, Plaintiff was released from the WCDC on felony citation. *Defts' Ex.* A-1 at 3, 30, 47.

On August 27, 2013, Plaintiff was discharged from the hospital with prescriptions for Benadryl, Trazodone, Betamethasone, and Keppra. *Defts' Ex.* C at 63-70. Her discharge diagnoses were: allergic drug rash; leukopenia; seizure disorder; trichomonas infection; and anxiety disorder. *Id.* At discharge, Dr. Wooden indicated it did not appear that the Plaintiff had SJS. *Id.* at 67. Her assessment and plan stated: "this appears to be morbilliform rash, probably associated with Dilantin use. At this time the patient does not appear to have any evidence of a severe desquamating rash such as Stevens-Johnson and will likely improve with withholding the offending medication, topical steroids, and oral antihistamines." *Id.*

Plaintiff testified it took her several months to heal and about a year to completely recouperate. Plaintiff submitted copies of pictures she indicates were taken after her discharge from the hospital on August 27th. *Plff's Ex.* C at 65-70. The photographs are black and white and not of the best quality. *Id.* It does appear however, as described above, that Plaintiff's body is covered in splotchy areas. *Id.*

---

[9]"Stevens-Johnson syndrome is a rare, serious disorder of your skin and mucous membranes. It's usually a reaction to a medication or an infection. Often, Stevens-Johnson syndrome begins with flu-like symptoms, followed by a painful red or purplish rash that spreads and blisters. Then the top layer of the affected skin dies and sheds.
Stevens-Johnson syndrome is a medical emergency that usually requires hospitalization. Treatment focuses on eliminating the underlying cause, controlling symptoms and minimizing complications."
http://www.mayoclinic.org/diseases-conditions/stevens-johnson-syndrome/basics/definition/con-20029623 (accessed July 6, 2016).

Defendants have provided the affidavit of Dr. W.H. Howard. *Defts' Ex.* E. He notes that he saw the Plaintiff on only one occasion on June 4, 2013, and her complaint at the time was anxiety and a vaginal yeast infection. *Id.* at ¶ 2(a-c).

Dr. Howard states that he reviewed the treatment provided by Dr. Mullins and the nursing staff and believes it was "reasonable and appropriate in light of the symptoms presented." *Id.* at ¶ 2(e). He asserts that a diagnosis of SJS would require a skin biopsy and there is no indication one was done. *Id.* at ¶ 2(g).

With respect to Dr. Mullins, the Plaintiff states he was the one who prescribed Dilantin. She felt he should have looked at the side effects for Dilantin.

With respect to Nurse Meschede, Plaintiff testified she: would say that the Plaintiff did not have a fever when she did; told other inmates that Plaintiff had "jailitis;" believed Plaintiff had strep throat; gave Plaintiff's medical information to detention center personnel and inmates; left Plaintiff in the hands of other inmates; and allowed Plaintiff's temperature to get so high that it caused damage to Plaintiff's "memory and brain."

Plaintiff testified her allegations against all three nurses are basically the same. Plaintiff indicated that all three nurses agreed.

Plaintiff testified that she was finding it difficult to keep solid food down and asked all three nurses to be put on a liquid diet. Plaintiff was becoming dehydrated. Plaintiff testified this went on for days.

### 2. Applicable Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." National Bank of Commerce v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing, Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

### 3. Discussion

Defendants have moved for summary judgment on the following grounds: (1) they were not deliberately indifferent to the Plaintiff's serious medical needs; and (2) they are entitled to qualified immunity.

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993). To prevail on a denial of medical care claim, the Plaintiff must show: (1) the existence of an objectively serious medical need; (2) that Defendants knew of and deliberately disregarded. Vaughn v. Gray, 557 F.3d 904, 908-09 (8th Cir. 2009).

It is undisputed that the Plaintiff had an objectively serious medical need. Clearly, she had a condition that caused her considerable discomfort and required treatment.

Instead, this case hinges on whether the Defendants exhibited the requisite mental state. Defendants' mental state must be akin to "criminal law recklessness, which is more blameworthy than negligence, yet less blameworthy than purposefully causing or knowingly bringing about

-10-

a substantial risk of serious harm to the inmate . . . . Deliberate indifference must be measured by the official's knowledge at the time in question, not by hindsight's perfect vision." Schaub v. VonWald, 638 F.3d 905, 914-15 (8th Cir. 2011)(internal quotation marks and citations omitted).

This standard is not met by the exercise of professional judgment in refusing to implement an inmate's requested course of treatment. Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (constitutional violation cannot rest on mere disagreement with treatment decisions); Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (inmates have no constitutional right to particular course of treatment, and doctors are free to use their own medical judgment); Logan v. Clarke, 119 F.3d 647, 649-50 (8th Cir. 1997) (prison doctors not deliberately indifferent where they treated the prisoner and offered sensible medication). Similarly, "[m]erely demonstrating that a prison doctor committed medical malpractice is insufficient to establish deliberate indifference." Jackson v. Buckman, 756 F.3d 1060, 1065-66 (8th Cir. 2014) (citations omitted). To constitute deliberate indifference, "[a]n inmate must demonstrate that a prison doctor's actions were so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." Id. at 1066 (internal quotation marks and citation omitted).

After careful consideration of the testimony given and the exhibits submitted by the parties, I conclude that although Defendants did not recognize as quickly as Plaintiff would like that the cause of Plaintiff's condition was the Dilantin, they did not exhibit deliberate indifference to the Plaintiff's serious medical needs. With respect to Dr. Mullins, there is nothing to suggest the initial prescription of Dilantin was anything but routine medical practice. Dilantin is a common anti-seizure medication; there was no evidence the dosage prescribed was inappropriate; and there was no evidence at the time that Plaintiff was allergic to it or would have any type of reaction to the medication.

Plaintiff's first mention of a rash contained in the record did not occur until August 11th. She was immediately put on the list to see the doctor. When her condition appeared to worsen, she was taken to Washington Regional Medical Center (WRMC) where she was diagnosed with hives, given an injection and put on Benadryl. There is nothing in the hospital records from this visit that mentions the possibility that the rash was related to the Dilantin. Plaintiff was given the prescribed medication and also given an antibiotic and a steroid by Dr. Mullins. The testimony indicated that both are helpful medications in combating rashes and associated symptoms. Dr. Mullins did not see the Plaintiff after August 13th although he was called about her condition on August 22nd and ordered an injection of nausea medication, steroids, and Benadryl.

Even if we conclude Dr. Mullins was negligent in failing to recognize that the rash was caused by the Dilantin, this is insufficient to establish deliberate indifference. McRaven v. Sanders, 577 F.3d 974, 982 (8th Cir. 2009)("Negligent misdiagnosis does not create a cognizable claim under § 1983"). His diagnosis does not rise to the level of criminal recklessness and was in accord with the diagnosis rendered by the first emergency room doctor who examined the Plaintiff. Plaintiff certainly did not show that the care provided so deviated from professional standards that it amounted to deliberate indifference. Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002). There is simply no genuine issue of fact as to whether Dr. Mullins exhibited deliberate indifference to Plaintiff's serious medical needs.

Similarly, I do not believe there are questions of material fact as to whether any of the nurses exhibited deliberate indifference to Plaintiff's serious medical needs. Each had a number of interactions with the Plaintiff between August 11th, when she made the first medical request regarding the rash, and August 26th, when she was released from incarceration. These interactions are set forth in some detail above.

During this time, the nurses checked on the Plaintiff multiple times and had her sent to the hospital on August 12th, August 23rd, and August 25th. All orders of the emergency room physicians and Dr. Mullins were followed. The medications authorized for the Plaintiff were ones typically used to combat rashes. Plaintiff was put on the list to see the doctor and/or they called the doctor about her condition on August 13th and August 22nd. Plaintiff was placed in medical holding for a portion of the time so her condition could be better monitored. There is simply no evidence of deliberate indifference on the part of the nurses.

There is no indication in the medical records that Plaintiff requested a liquid diet. Further, there is no evidence suggesting the nurses released Plaintiff's medical information to anyone other than detention personnel involved in monitoring her condition and/or providing information on which to base the decision of whether or not she should be taken to the hospital. Finally, there is nothing, other than Plaintiff's conclusory statement to indicate she suffered any brain damage as a result of the nurses allowing her fever to get too high.

Defendants are entitled to summary judgment. Further, having found that the facts do not make out a constitutional violation, Defendants are entitled to qualified immunity. See, e.g., Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

### 4. Conclusion

For the reasons stated, I recommend that Defendants' Motion for Summary Judgment (Doc. 55) be **GRANTED and this case DISMISSED WITH PREJUDICE.**

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties**

**are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 8th day of July 2016.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)